1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7              FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   ARTHUR FISHER,                     No C 05-4383 VRW

10           Plaintiff,                ORDER

11           v

12   MICHAEL J ASTRUE,
    COMMISSIONER OF SOCIAL SECURITY,

13           Defendant.

14   _____/

15

16

17

18

19          Plaintiff Arthur Fisher brings this action under 42 USC §

20   405(g) seeking judicial review of the Social Security

21   Administration's (SSA's) final decision denying his applications for

22   both disability insurance benefits and supplemental security income

23   benefits under the Social Security Act (Act), 42 USC §§ 401-33.  The

24   parties have filed cross-motions for summary judgment.  Doc #13; Doc

25   #14.  For the reasons stated herein, plaintiff's motion is GRANTED

26   and defendant's motion for summary judgment is DENIED.  The case is

27   remanded for further proceedings.

28   \\

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

## I

### A

Plaintiff was born on August 5, 1958.  At the time of his administrative hearing, plaintiff was five feet four inches tall and weighed approximately 125 pounds.  Plaintiff's highest level of education completed was the eleventh grade.  He has no specific vocational skills.  His occupational history includes work as a laborer for a roofing company, a restaurant waiter, a security guard and, most recently, a temporary worker folding t-shirts.

Plaintiff suffers from a number of ailments.  He suffers degenerative arthritis affecting his back, hips and knees; his knees have a tendency to dislocate causing him to fall.  He has hepatitis C that was not acute at the time of the proceedings under review on this appeal.  Mental impairments include depression and psychotic symptoms of uncertain etiology.  The medical records also note cannabis abuse with a possibility of cannabis-induced psychosis.  AR 13.  Plaintiff's orthopedic conditions limit his exertional activities, including sitting and standing.  Plaintiff contends that the combination of his ailments renders him unable to maintain employment.  AR 28.  Although plaintiff has had recurring dislocation of the knees since childhood, he claims that the onset date of his disability is September 3, 2003.  AR 13.

Plaintiff has seen a number of doctors for his ailments and in connection with his applications for disability benefits. Medical records in the record from plaintiff's treating physicians date from January 2000 to May 2004.  AR 136-52, 196-218. His primary treating physician during these years was Dr Kenneth Matsumura of the West Oakland Health Center.

United States District Court
For the Northern District of California

1    On October 24, 2003, Dr Walker, an internal medicine
2    specialist at the James A Watson Wellness Center, examined plaintiff
3    and completed an "Employability/Medical Statement" to determine
4    eligibility for food stamps and assistance from the Alameda County
5    Social Services Agency.  AR 219.  Dr Walker noted that plaintiff
6    complained of arthritis in both knees and "chronic" dislocation of
7    the knees.  Id.  Dr Walker also reported that plaintiff felt as
8    though "the Devil" was holding him down while in his sleep.  Id.  Dr
9    Walker classified plaintiff as "unemployable" and checked off boxes
10   stating that plaintiff could not lift even five pounds, reach,
11   climb, kneel, do knee bends or stand.  AR 220.

12   On January 11, 2004, in connection with his application
13   for social security benefits, plaintiff saw consulting orthopedist
14   Dr Ray Raven.  AR 126-29, 130-35.  Dr Raven noted that plaintiff
15   could stand and walk no more than two hours in an eight-hour day but
16   that there were no restrictions on the number of hours plaintiff
17   could be expected to sit in an eight-hour day and that plaintiff
18   could frequently and/or occasionally lift up to ten pounds.  AR 129.
19   Dr Raven's report found no manipulative limitations in his upper
20   extremities and did not mention a pinched nerve.  The report listed
21   plaintiff's medications as amitriptyline, diclofenac, benadryl and
22   vicodin.  AR 127.

23   On January 12, 2004, plaintiff saw Dr April Young,
24   consulting psychologist, for his alleged mental impairments.  She
25   conducted a full psychological evaluation of plaintiff that included
26   a memory test, an adult intelligence scale test and a visual motor
27   test.  AR 132.  Dr Young noted that plaintiff was alert and oriented
28   during the mental status exam and that he displayed adequate

United States District Court
For the Northern District of California

attention and concentration for conversation.  AR 132.  Dr Young also noted that he denied past or current use of drugs.  Id.  To Dr Young, plaintiff listed his medications as amitriptyline/ perphenazine and diclofenac and stated that he had been taking these medications for fifteen years.  AR 132.  After noting that her results should be "interpreted with caution given the claimant's variable effort during [the] exam," Dr Young found that plaintiff's ability to relate to others, including potential co-workers and supervisors, in an appropriate manner was moderately impaired, his ability to "maintain the appropriate level of concentration, pace, and persistence necessary to perform a one or two-step simple repetitive task [was] unimpaired," but his ability to perform a detailed or complex task was impaired.  AR 134.

Dr Young noted that plaintiff told her he had "bad nerves," disliked loud noises and had episodes during which he felt pinned down to his bed by "the Devil."  AR 132-33.  Dr Young diagnosed plaintiff with psychotic disorder NOS, anxiety disorder NOS and noted the possibility of cognitive disorder NOS.  AR 133.  Dr Young also noted that plaintiff's performance on measures of intelligence ranged from "extremely low to average" and opined that he was incapable of managing his supplementary funds in his best interest at that time.  AR 133-34.

Among "behavioral observations," Dr Young noted plaintiff's "gross motor functioning was remarkable for disrupted gait.  Upon rising from his seat, he braced himself in the doorway and stated that he had been sitting too long."  AR 132.

From February 28, 2005 to March 4, 2005, plaintiff sought treatment for depression from the Alameda County Department of

4

United States District Court
For the Northern District of California

1   Behavioral Health Care Service's Mental Health Division's crisis
2   program.  There, plaintiff admitted using marijuana twice per week.
3   Plaintiff presented as "depressed, teary-eyed and unable to express
4   his thoughts."  AR 190.  He also complained of interruptions during
5   sleep, hearing mumbling noises at night, seeing lights and feeling
6   restrained upon awakening.  AR 192.  Plaintiff was given Zoloft and
7   Trazodone, two commonly-prescribed antidepressants.  AR 189.

8       On April 8, 2005, plaintiff saw Dr Luisito Roxas, a
9   psychiatrist at the Sausal Creek Clinic, who completed a report
10  evaluating plaintiff's ability to do work-related activities.  AR
11  221.  Dr Roxas noted that plaintiff "seem[ed] to be quite capable of
12  following instructions."  Id.  Dr Roxas checked boxes indicating
13  that plaintiff was moderately impaired in five out of five work-
14  related mental activities.  AR 222.  He made note of plaintiff's
15  reported general discomfort around groups of people and his tendency
16  to withdraw from such settings.  He also wrote that plaintiff "has
17  reduced cannabis abuse which seems to have created greater energy +
18  improved mood" and "initial depression symptoms have lifted with
19  antidepressant meds and recomm of altering [marijuana] use."  Id.

20      On April 11, 2005, Dr Matsumura, the treating physician at
21  the West Oakland Health Center whom plaintiff had seen regularly for
22  five years or more (see, e g, AR 212), completed a Residual
23  Functional Capacity (RFC) assessment in which he opined that
24  plaintiff could stand for less than two hours and sit for less than
25  six hours in an eight-hour workday, explaining that plaintiff "has a
26  severe form of degenerative arthritis involving multiple joints,
27  including knees, hips and back being most symptomatic."  AR 224.  Dr
28  Matsumura also noted that plaintiff was "also developing symptoms

United States District Court
For the Northern District of California

suggestive of [a] nerve pinch of cervical region —— this results in pain of shoulder."  Id.  Dr Matsumura further reported that plaintiff was limited in his ability to carry out pushing and pulling activities and was "absolutely" limited in performing manipulative functions, such as reaching for or handling objects. AR 225.  His handwritten annotation explained that "[a]lthough these activities may appear to be related only to the hands, actually entire upper limbs become involved in such activities —— therefore his symptomatology related to cervical disc impairment will likely worsen."  Id.  Dr Matsumura noted that seeing, hearing and speaking functions were unaffected, but recommended evaluation for scintillating scotoma, a precurser to migraine headaches, of recent onset.  Id.  Of note, the RFC assessment form covered physical issues only and did not ask Dr Matsumura's opinion about mental/physchological RFC issues.

**B**

On November 12, 2003 plaintiff filed applications for disability insurance benefits and supplemental security income benefits giving a disability onset date of September 3, 2003.  AR 50-52.  The application was denied initially and on reconsideration. AR 24-27, 30-34.  Plaintiff then requested a hearing and the case was assigned to an Administrative Law Judge (ALJ).  AR 37.

During the hearing before the ALJ on April 13, 2005, plaintiff testified that he had worked at the Claremont House as a waiter sometime during 2002 and had previously worked as a security guard and a roofer.  AR 273.  He also testified that he had problems with his knees, back and shoulders.  AR 275.  Plaintiff testified

United States District Court
For the Northern District of California

1   that he suffered from "constant dislocation of his knees," which

2   happened anywhere "from three or four times a week to twice a week."

3   AR 275-76.  Plaintiff also added that when the dislocation happened,

4   he would fall and "It's like extreme pain for like five, maybe ten

5   minutes, and then it goes down to an ache and then it swells" and

6   that his "knees hurt constantly."  AR 276.  Plaintiff also

7   complained of lower back pain when sitting for a long period of

8   time.  AR 279.  When asked whether he took public transportation,

9   plaintiff said no, because it was "too hard to get up and down,"

10  "not safe" and he could not be around "the people, * * * kids on the

11  bus making noise, laughing, talking []."  AR 283.

12          The ALJ asked plaintiff about his "mental problems."

13  AR 280.  Plaintiff testified that the episodes of feeling restrained

14  and unable to move or speak on awakening as well as hearing voices

15  in the form of a "mumbling noise" had been present since childhood.

16  AR 279-80.  Plaintiff admitted to using marijuana for medical

17  purposes and found it effective in reducing the pain in his knees;

18  specifically, he testified that he used marijuana once or twice a

19  month only about five times before going to see Dr Roxas.  AR 288.

20          The ALJ also heard testimony from Dennis Contreras, a

21  vocational expert (VE).  The ALJ posed a hypothetical question to

22  the VE describing a worker with plaintiff's age, education and

23  experience.  The ALJ also specified a "combined sit, stand and walk

24  up to a full eight hour day" with various terrain and postural

25  restrictions.  AR 292.  When the ALJ asked what jobs such a worker

26  could perform, the VE listed four:  information clerk, small product

27  assembler I, general clerk and hand packager.  AR 293-95.  Only one

28  of the jobs, information clerk, was listed as "sedentary" in the

7

United States District Court
For the Northern District of California

Dictionary of Occupational Titles (DOT). AR 293. Two of the jobs, small product assembler I and general clerk, were listed as "light." Id. The fourth, hand packager, was listed as "medium." Id. The VE testified, however, that a subset of sedentary jobs was available in each of these categories. Id. For example, he testified that of 56,000 product assembler jobs in the national economy, there were 380 sedentary positions in the local economy. Id.

Plaintiff's attorney also examined the VE in an effort to determine whether his opinion would vary if (1) mental health and/or cognitive limitations missing from the ALJ's hypothetical were included and (2) in accordance with Dr Matsumura's opinion, plaintiff were limited to six, rather than eight, hours of sitting. The VE generally responded that if "moderate" mental impairment meant plaintiff's concentration, persistence and/or pace were affected 10-20% of the time, employers would tolerate it, but not more than 20%. AR 300-02. The VE also responded that a very low range of intellectual functioning would make it difficult for plaintiff to obtain or maintain employment as an information clerk or a general clerk. AR 303. Regarding whether a limitation to six hours per day of sitting would erode an applicant's job base, the VE responded that "there might be some erosion" but many of the sedentary jobs were sitting or standing at will. AR 309. He testified, however, that the need to use a cane when standing would not be an issue if limited to five minutes per hour. AR 310-11.

On June 28, 2005, the ALJ issued a decision, finding that while plaintiff suffered from degenerative joint disease and recurrent dislocation of the knees, he was not disabled as defined by the Act because there were "jobs existing in significant numbers

United States District Court
For the Northern District of California

1  in the national economy that [the] claimant can perform."  AR 19-20.

2  The ALJ relied on much, but not all, of Dr Raven's opinion to

3  determine plaintiff's RFC, finding him able to sit for eight hours

4  and stand/walk for less than two hours in an eight-hour day, but

5  able to climb, stoop, crouch and crawl "on only rare occasions" and

6  to lift/carry no more than ten pounds.

7       The ALJ did not accord treating physician Dr Matsumura's

8  assessment controlling weight.  AR 16.  The ALJ wrote that the

9  medical evidence did not document clinical findings to support Dr

10  Matsumura's theory of a pinched nerve in the cervical spine and that

11  this problem was, in any event, of less than twelve months'

12  duration.  Id.  Also, the ALJ determined that plaintiff's

13  symptomatic and conservative medical regimen was "inconsistent" with

14  Dr Matsumura's opinion that plaintiff exhibited significantly

15  diminished functional ability.  Id.

16       The ALJ made note of the medical evaluation for the

17  Alameda County Social Services Agency which concluded that plaintiff

18  was "unemployable" (supra part I.A), but seemed to discount this

19  opinion because plaintiff's "reported daily activities also exceed

20  the functional limitations assessed."  AR 16.  The ALJ noted that

21  plaintiff "is able to perform some cooking, shopping, laundry, and

22  watering plants, * * * read the daily newspaper and play chess."  Id.

23       With respect to mental impairments, the ALJ noted Dr

24  Young's statement that the results of the psychological exam should

25  be "interpreted with caution given the claimant's variable effort

26  during the evaluation."  Id at 17 and supra.  Based on this

27  statement, the ALJ concluded that the results of the examination did

28  not reflect plaintiff's actual mental condition.  Id.  The ALJ made

United States District Court
For the Northern District of California

note of Dr Young's mention of plaintiff's fifteen-year history of taking amitriptyline/perphenazine and diclofenac but did not mention these medications again in his decision.  AR 14.

Instead, the ALJ discussed the reports from the Alameda County Behavioral Health Care Services, Mental Health Services and determined that they supported a diagnosis of depression which he found not to have existed for twelve continuous months.  AR 17.  The ALJ concluded that plaintiff was "only mildly impaired with regard to activities of daily living and in concentration, persistence or pace" and that, socially, he was only "mildly-moderately limited." Id.  The ALJ seized on plaintiff's admission of occasional medical marijuana use as an explanation for his psychotic and depressive symptoms:

> The progress notes show good response and improvement of the depression symptoms (concurrent with a decline in cannabis use) to permit work activity without significant limitation.
>
> * * *
>
> At the hearing, claimant testified that he had smoked marijuana although not on a continuous basis.  This evidence leads me to find that claimant's complaints of auditory and visual hallucinations can be attributed to the drug abuse.

AR 17.

Regarding plaintiff's credibility, the ALJ acknowledged "[t]here are certainly medical disorders to account for claimant's subjective complaints" but found that the "alleged intensity, persistence and functionally limiting effects of his symptoms are not entirely credible."  AR 18.  The ALJ noted:  plaintiff's complaints of lower back pain were not supported by the medical findings and treatment; the mental symptoms responded to

United States District Court
For the Northern District of California

conservative treatment; plaintiff denied drug use to Dr Young, but later admitted it at the Alameda County Behavioral Health Care Services.  Id.  Based on these seemingly inconsistent statements, the ALJ determined that plaintiff had not been "honest and forthcoming."  Id.  The ALJ observed that although the knee condition had affected plaintiff for "many years," plaintiff had still been able to work as a "waiter and roofer for extended periods."  Id.  The ALJ then concluded that the severity of the symptoms alleged was "not entirely credible," and found that plaintiff retained at least some capacity for work.  Id.

## II

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 USC § 405(g).  Accordingly, a district court may overturn a decision to deny benefits only if the decision is not supported by substantial evidence or if the decision is based on legal error.  Andrews v Shalala, 53 F3d 1035, 1039 (9th Cir 1995) (citing Magallanes v Bowen, 881 F2d 747, 750 (9th Cir 1989)).  The Ninth Circuit defines substantial evidence as more than a "mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.

"Disability" is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment * * * which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 CFR § 404.1505(a).  The ALJ conducts a five-step test

11

United States District Court
For the Northern District of California

1  to determine whether a claimant is disabled and eligible for
2  benefits.  Step one asks whether the claimant is currently engaged
3  in substantial gainful activity.  If the claimant is not working,
4  step two considers whether the claimant has a severe medically
5  determinable impairment that is expected to last more than twelve
6  months.  If so, the next step asks whether the impairment meets or
7  equals a listed impairment in Part 404, Subpart P, Appendix 1.  If
8  so, the claimant is deemed disabled.  If not, step four considers
9  whether the impairments prevent the claimant from doing his past
10  relevant work.  If the claimant shows that he cannot perform his
11  past relevant work, the burden then shifts to the government to show
12  that there are other jobs in the economy that can be performed by
13  the claimant at step five.  20 CFR § 404.1520, § 416.920.

14

15                               III

16          The court notes at the outset that this is a close case.
17  If plaintiff is not disabled, he is very nearly so.  The medical-
18  vocational guidelines (known as the "grids") at 20 CFR Part 404
19  Subpart P Appendix 2 apply when an individual is able to perform the
20  full range of work at a particular level.  Tackett v Apfel, 180 F3d
21  1094 (9th Cir 1999).  The grids do not apply to plaintiff's
22  situation because (1) he cannot perform the full range of sedentary
23  work and (2) plaintiff suffers from both exertional and non-
24  exertional limitations, whereas the grids only apply where "a
25  claimant's functional limitations fall into a standardized pattern
26  'accurately and completely' described by the grids."  Id at 1103.
27  The introduction to the grid regulations is nonetheless instructive
28  here to the extent that it addresses the challenges individuals

United States District Court
For the Northern District of California

without relevant skills face in transitioning to sedentary work due to physical limitations:

> Vocational adjustment to sedentary work may be expected where the individual has special skills or experience relevant to sedentary work or where age and basic educational competences provide sufficient occupational mobility to adapt to the major segment of unskilled sedentary work. Inability to engage in substantial gainful activity would be indicated where an individual who is restricted to sedentary work because of a severe medically determinable impairment lacks special skills or experience relevant to sedentary work, lacks educational qualifications relevant to most sedentary work (e g has a limited education or less) and the individual's age, though not necessarily advanced, is a factor which significantly limits vocational adaptability.

20 CFR Part 404, Subpart P, Appendix 2, § 201(c). Plaintiff's eleventh-grade education is "limited" under the social security regulations, meaning "not enough to allow a person * * * to do most of the more complex job duties needed in semi-skilled or skilled jobs." 20 CFR § 404.1564(c), 416.964(c). Under grid rule 201.17, were plaintiff able to perform the full range of sedentary work but illiterate or unable to communicate in English, he would have been deemed disabled even as a "younger individual" of forty-six in view of his limited education and lack of specific vocational skills. 20 CFR Part 404, Subpart P, App 2 § 201(g) and § 201.17. Although plaintiff is able to speak English, this strength appears counterweighed by the dual burdens of impaired ambulation and significant, chronic mental health issues. These limitations are more fully discussed in the following sections.

Turning to plaintiff's specific contentions, plaintiff's appeal argues that the ALJ committed legal error by:  (1) not properly considering whether plaintiff's impairment met or equaled

13

**United States District Court**
For the Northern District of California

the listings (Doc #13 at 3-4); (2) failing to set forth "legally sufficient reasons for rejecting the opinions of Kenneth Matsumura, MD, [plaintiff's] treating physician" (Doc #13 at 7); (3) not properly considering the "impact [plaintiff's] mental impairment would have on the occupational base" (Doc #13 at 7-8); (4) improperly discrediting his subjective testimony; and (5) relying on testimony by the VE that he asserts was flawed by its reliance on jobs in the "medium" and "light" work categories.  Doc #13 at 9-13. The court addresses each of these points in turn.

A

1

Plaintiff first contends that the ALJ committed legal error by not properly considering whether the knee impairment equaled the criteria for disability due to "major dysfunction of a joint" in 20 CFR Part 404 Subpart P, Appendix 1.  "Major dysfunction of a joint" requires:

> gross anatomical deformity (e g, subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s)
>
> and
>
> findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints(s)
>
> with
>
> (A) Involvement of one major peripheral weight-bearing joint (i e, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

14

United States District Court
For the Northern District of California

20 CFR Pt 404, Subpt P, App 1 § 1.02(A).  The Listing defines ineffective ambulation as "an extreme limitation of the ability to walk; i e, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain or complete activities."  20 CFR Pt 404, Subpt P, App 1 § 1.00(B)(2)(b)(1). Examples of ineffective ambulation "include, but are not limited to":

> the inability to walk without use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 CFR Pt 404, Subpt P, App 1 § 1.00(B)(2)(b)(2).  "Effective ambulation" requires that "individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."  Id.  Independently walking around one's home without assistive devices "does not, in an of itself, constitute effective ambulation."  Id.

The ALJ must find that a claimant is disabled if he determines at step three that he has an impairment that meets or equals one of the listings in 20 CFR Part 404 Subpart P, Appendix 1. 20 CFR § 404.1520(a)(4)(iii).  "To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim."  Tackett v Apfel, 180 F3d 1094, 1099 (9th Cir 1999).  "To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment * * *."  Id.  The ALJ, in his decision,

United States District Court
For the Northern District of California

1 "must adequately explain his evaluation of the evidence and the

2 combined effects of the impairments." <u>Marcia v Sullivan</u>, 900 F2d

3 172, 176 (9th Cir 1990).

4          Here, there is no dispute that plaintiff meets one of the

5 criteria mentioned in Listing § 1.02(A):  knees that sublux, or

6 dislocate, spontaneously.  AR 128.  It is also undisputed that

7 plaintiff has not shown any findings on appropriate medically

8 acceptable imaging of joint space narrowing, bony destruction or

9 ankylosis of the affected joint(s).  The effectiveness of

10 plaintiff's ambulation, an important issue not specifically

11 addressed in the ALJ's decision, is discussed below.  Plaintiff's

12 symptoms fail to meet Listing § 1.02, but plaintiff contends on

13 appeal that the ALJ erred in not considering whether his impairments

14 equaled the listing.

15          Plaintiff argues that the ALJ's decision did not

16 adequately explain the ALJ's evaluation of the evidence as required

17 under <u>Marcia v Sullivan</u>.  The court agrees.  The ALJ determined that

18 "[t]he clinical and laboratory findings * * * [did] not meet or

19 equal any listed impairment of Appendix 1 to Subpart P of Regulation

20 No 4."  AR 253.  The ALJ's decision, however, failed to discuss

21 "equivalence" in determining that plaintiff was not disabled under

22 the listing.  The ALJ also failed to explain his evaluation of the

23 evidence as required by <u>Marcia v Sullivan</u> on the issue of whether

24 plaintiff could ambulate effectively.

25          The record is less than clear as to whether plaintiff's

26 ambulation is effective or ineffective within the meaning of 20 CFR

27 Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(b).  The record

28 suggests that an ever-present risk of spontaneous dislocation of the

**United States District Court**
For the Northern District of California

knees attends plaintiff's walking.  According to plaintiff's
testimony:  dislocation occurs spontaneously while he is walking (AR
276); he has difficulty going up and down stairs because of an
increased risk of dislocation (AR 284-85); and he does not take
public transportation because it is "too hard to get up and down."
AR 283.  This latter limitation —— the inability to use public
transportation —— is specifically listed among examples of
ineffective ambulation in the regulation.

While plaintiff acknowledged his ability to carry out some
activities around the house and the ALJ seized on these facts in
discounting the medical opinion that plaintiff was "unemployable"
(AR 16), the regulations state that the ability to walk around the
home unassisted does not alone constitute effective ambulation.  20
CFR Pt 404, Subpt P, App 1 § 1.00(B)(2)(b)(2).  Moreover, the Ninth
Circuit has held that "the mere fact that a plaintiff has carried on
certain daily activities * * * does not in any way detract from her
credibility as to her overall disability.  One does not need to be
'utterly incapacitated' in order to be disabled." Benecke v
Barnhart, 379 F3d  587, 594 (9th Cir 2004).

This court's review of the record indicates that the ALJ
ignored important evidence suggesting that plaintiff's difficulties
with ambulation were sufficient to equal Listing 1.02 and that
remand for more careful review of this issue is required.

2

Plaintiff argues that the ALJ erred in failing adequately
to assess the impact of his mental impairments.  Doc #13 at 8.

To evaluate a claim of disability based on mental
impairment, the ALJ is required to employ a "special technique" at

the administrative hearing level to assist in (1) identifying the need for additional evidence, (2) considering and evaluating the functional consequences of the mental disorder on the claimant's ability to work and (3) organizing and presenting the facts.  See 20 CFR § 404.1520a(a), 416.920a(a).  Applying the special technique, the ALJ must first evaluate all pertinent symptoms, signs and laboratory findings to determine whether the claimant has a mental impairment.  If the ALJ determines that the claimant has a "medically determinable mental impairment," the ALJ must specify how the claimant's functioning is affected by such factors as chronic mental disorders, structured settings, medication and other treatment.  The ALJ must rate the degree of functional limitation in four areas:  activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 CFR § 404.1520a(c)(3).  "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."  20 CFR § 404.1520a(c)(4).  The ALJ then determines the severity of the claimant's mental impairment(s).  20 CFR § 404.1520a(d).

      The regulation specifically requires the ALJ to document use of the special technique in the decision:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 CFR § 404.1520a(e).  A record containing evidence of mental impairment allegedly preventing claimant from working requires

United States District Court
For the Northern District of California

1  adherence to the procedures set forth in the regulations for

2  evaluating the potential mental impairment and requires

3  documentation of those procedures.  Gutierrez v Apfel, 199 F3d 1048,

4  1051 (9th Cir 2000), quoting Hill v Sullivan, 924 F2d 972, 975 (10th

5  Cir 1991).  An ALJ's failure to complete required documentation when

6  a colorable claim of mental impairment exists provides sufficient

7  cause for remand.  Gutierrez, 199 F3d at 1051.  Only when "no viable

8  claim of mental impairment" exists does a failure to complete

9  required documentation not require reversal.  Id.

10        Here, Dr Young diagnosed plaintiff with psychotic disorder

11  NOS, anxiety disorder NOS and wanted to rule out cognitive disorder

12  NOS.  AR 133.  Dr Young noted that plaintiff complained about "bad

13  nerves," hearing from the Devil and having episodes where he felt

14  pinned down to his bed.  AR 133.  In a subsequent examination at the

15  Alameda County Department of Behavioral Heath Care Service,

16  plaintiff complained of interruptions during sleep, hearing mumbling

17  noises at night and seeing lights.  AR 187-88.

18        The record contains several references to plaintiff having

19  a fifteen-year history of taking amitriptyline and perphenazine,

20  which plaintiff stated was prescribed by Dr Matsumura.  See, e g, AR

21  95, AR 105.  There are no legible treatment notes confirming that

22  plaintiff received these prescriptions, but the ALJ did not indicate

23  disbelief or skepticism about plaintiff's use of these medications.

24  Amitriptyline is a tricyclic anti-depressant.  MedlinePlus Drug

25  Information webpage, National Institutes of Health,

26  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html,

27  consulted 10/1/07.  Perphenazine is an anti-psychotic medication

28  used to treat "schizophrenia and symptoms such as hallucinations,

United States District Court
For the Northern District of California

delusions, and hostility." Id at a682388.html, consulted 9/23/07.
Plaintiff was also prescribed antidepressants during an episode of
severe depression in February 2005. AR 189. This evidence gives
rise to a colorable claim of mental impairment. Accordingly, the
ALJ was required to follow the procedures set forth in
20 CFR § 404.1520a/416.920a.

The ALJ's compliance with the "special technique" rules
was perfunctory and, in the court's view, insufficient. Although
plaintiff admitted to at most sporadic and recent cannabis use, the
ALJ found that plaintiff's psychotic symptoms were attributable to
"the drug abuse." AR 17. This finding is not supported by
substantial evidence, but rests rather on a comment in a report by a
consulting psychiatrist who saw plaintiff only once. See AR 222.
Given this doctor's lack of a treating relationship with plaintiff,
his report that plaintiff "has reduced cannabis abuse which seems to
have created greater energy and improved mood" appears likely to
have been based on a comment by plaintiff himself expressing such an
opinion -- hardly an appropriate foundation for a determination that
plaintiff's mental health problems are not disabling and of short
duration. Although the ALJ mentioned plaintiff's other psychotropic
drugs in his factual narrative (AR 14), he did not mention them in
his analysis. The decision only discussed cannabis-induced
psychosis, but did not consider the evidence of psychosis from other
causes. To the extent that the ALJ addressed the impact of mental
impairments on RFC, he did so in a cursory manner (e g, "I do not
find that depression further erodes claimant's occupational base" AR
17), and, of note, he included no mental-health-related limitations
in his hypothetical to the VE.

United States District Court
For the Northern District of California

In a case in which a claimant has at least one severe impairment, the SSA is required to consider the limiting effects of <u>all</u> the claimant's impairments, even those that are not severe, in determining RFC.  It does not appear that the ALJ did so here.  20 CFR § 404.1545(e), § 416.945(e).

The SSA's errors in handling the evidence pertaining to plaintiff's alleged mental impairments requires remand to the agency for re-evaluation in compliance with 20 CFR § 404.1520a/416.920a and 20 CFR § 404.1545(e)/416.945(e).


B

Next, plaintiff argues that the ALJ erred in discounting the testimony of treating physician Dr Matsumura in determining plaintiff's RFC and that he failed to set forth legally sufficient reasons for rejecting Dr Matsumura's opinion.

More weight is given to opinions from treating sources since these sources "are likely to be the medical professionals most able to provide a detailed longitudinal picture of [claimant's] medical impairments."  20 CFR § 404.1527(d)(2), 416.927(d)(2).  The longer a treating physician has treated a claimant and the more times he has seen him/her, the more weight the SSA "will give" to that physician's opinion.  20 CFR § 404.1527(d)(2)(ii), § 416.927(d)(2)(ii).  When the treating physician's opinion is contradicted by another medical opinion, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence" when rejecting the opinion of a treating physician. <u>Lester v Chater</u>, 81 F3d 821, 830 (9th Cir 1995), quoting <u>Murray v Heckler</u>, 722 F2d 499, 502 (9th Cir 1983).

1    Here, the ALJ relied more heavily on the opinion of Dr
2  Raven, a consulting examining physician, over the opinion of Dr
3  Matsumura in the RFC determination.  Dr Raven opined that plaintiff
4  could stand and/or walk for less than two hours in an eight-hour day
5  and could sit without restrictions.  AR 129.  Dr Matsumura reported,
6  however, that plaintiff could sit for less than about six hours in
7  an eight-hour day, must periodically alternate sitting and standing
8  to relieve pain or discomfort and noted the possibility of a pinched
9  nerve in the cervical region of the spine contributing to functional
10 loss, on the strength of which he noted significant postural and
11 manipulative limitations.  AR 224.

12    The ALJ found the "symptomatic and conservative medical
13 care" prescribed by Dr Matsumura inconsistent with the opinion that
14 plaintiff suffered from significantly diminished functional ability
15 and discounted the pinched-nerve theory due to lack of objective
16 clinical findings.  AR 16.

17    The reasons provided by the ALJ in discounting Dr
18 Matsumura's opinion are not sufficiently specific and legitimate.
19 The ALJ discounted Dr Matsumura's opinion because no other doctor
20 mentioned the possibility of a pinched nerve, but he failed to take
21 into account that Dr Matsumura's report was dated more than one full
22 year after Dr Raven's, such that plaintiff's condition may have
23 deteriorated in the time between the two examinations.  Given the
24 diagnosis of degenerative joint disease, plaintiff's RFC might well
25 have deteriorated in the thirteen months after Dr Raven's
26 examination.  The most up-to-date examination results in the record
27 are those by Dr Matsumura.
28 \\

United States District Court
For the Northern District of California

1    The ALJ also rejected Dr Matsumura's opinion partly

2  because of the perceived inconsistency between the diagnosis of

3  "significantly diminished functional ability" and the provision of

4  only "symptomatic and conservative medical care."  Defendant

5  contends that <u>Johnson v Shalala</u>, 60 F3d 1428, 1433 (9th Cir 1995),

6  allows an ALJ to discredit a treating physician's opinion if it is

7  contradicted by a prescription of conservative care.  Doc #14 at 5.

8  However, <u>Johnson</u> does not apply here.  In <u>Johnson</u>, the treating

9  physician first reported that the claimant was temporarily disabled

10 and needed only a program of conservative care.  60 F3d at 1433.

11 Some years later the physician concluded that the claimant had been

12 totally disabled all along.  Id.  The court held that the

13 contradictions in the report allowed the ALJ to disregard the

14 physician's opinions.  Id.

15   Here, the contradiction can be explained in a manner not

16 considered by the ALJ.  Plaintiff received a certain level of care

17 for his documented degenerative joint disease.  At the April 11,

18 2005, examination Dr Matsumura noted reduced functional ability, the

19 possibility of a pinched nerve and a "cervical disc impairment."  AR

20 225.  He also noted that "scintillating scotoma," a precursor to

21 migraine headaches, had recently developed.  Id.  Dr Matsumura's

22 report suggests a dynamic, worsening situation not inconsistent with

23 past conservative care.

24   Substantial evidence does not support the ALJ's decision

25 to discount Dr Matsumura's opinion.  The reasons given by the ALJ

26 are insufficient to overcome the presumption of controlling weight

27 given to the treating physician.

28 \\

United States District Court
For the Northern District of California

1    When the ALJ improperly rejects the opinion of a treating

2    physician, the opinion is credited as a matter of law.  Lester, 81

3    F3d at 834, citing Hammock v Bowen, 879 F2d 498, 502 (9th Cir 1989).

4    The ALJ noted correctly, however, that the upper-spine pain and the

5    functional limitations recommended because of it were of less than

6    twelve months' duration.  Therefore, this part of the opinion was

7    excluded from the disability determination.  Cf 20 CFR § 404.1512

8    ("Unless your impairment is expected to result in death, it must

9    have lasted or must be expected to last for a continuous period of

10   at least 12 months.")  Dr Matsumura's opinions regarding plaintiff's

11   exertional limitations (AR 223-24) must, however, be credited for

12   purposes of plaintiff's disability determination.

13

14                                 C

15   Plaintiff maintains that the ALJ erred by not proposing a

16   complete and accurate hypothetical to the vocational expert.

17   Doc #13 at 9.  Plaintiff argues that the VE's testimony has no

18   evidentiary value because the hypotheticals did not include any

19   mental limitations.

20   Hypothetical questions posed to the vocational expert must

21   include all of the claimant's limitations and restrictions.  Embrey

22   v Bowen, 849 F2d 418, 422 (9th Cir 1988).  Here, plaintiff's mental

23   impairments were addressed by the VE during the administrative

24   hearing, albeit only under questioning from plaintiff's attorney.

25   The hypothetical questions posed by the ALJ only included physical

26   limitations.  Plaintiff's attorney, however, asked the VE such

27   questions as whether an individual moderately impaired in the

28   ability to maintain concentration, persistence or pace or with

United States District Court
For the Northern District of California

1  modest cognitive abilities in the "borderline" range would be able

2  to maintain employment in the four job categories and obtained

3  answers to these questions on the record.  The VE's opinion

4  therefore has evidentiary value.

5

6                                    D

7       Plaintiff contends that the ALJ erred by not properly

8  considering his subjective symptoms of pain and rejecting his

9  testimony on the grounds that he was not credible.  Doc #13 at 9.

10  Plaintiff also contends that the ALJ failed to support his

11  credibility findings with legally sufficient reasons for the

12  disbelief.  Doc #13 at 10.

13       The ALJ is required to make a full and detailed finding as

14  to the claimant's credibility whenever it is a critical factor in

15  the decision.  Albalos v Sullivan, 907 F2d 871, 873-74 (9th Cir

16  1990).  An ALJ's rejection of a claimant's testimony on subjective

17  complaints is valid if the findings are "sufficiently specific to

18  allow a reviewing court to conclude" that the ALJ's decision was

19  made on permissible grounds.  Bunnell v Sullivan, 947 F2d 341, 346

20  (9th Cir 1991) (en banc).

21       Here, the ALJ's disbelief of plaintiff's subjective

22  complaints was based on seemingly inconsistent statements about the

23  extent of his marijuana use and on the fact that plaintiff's last

24  job ended when the work was completed, not because he became unable

25  to work.  AR 18.  The ALJ pointed to the latter fact as an

26  indication that plaintiff "retains some capacity for work."  Id.

27       Given that the court has determined that a remand is

28  necessary for other issues, it declines to review the ALJ's

United States District Court
For the Northern District of California

1   determination regarding plaintiff's credibility.  Plaintiff's

2   credibility should be considered anew as appropriate for the re-

3   determination of issues on remand.

4

5                                    E

6           Finally, plaintiff argues that the ALJ erred in

7   considering the VE's testimony on the grounds that the VE deviated

8   from the job descriptions in the DOT.  Plaintiff contends that

9   because the VE provided jobs classified as "light" or "medium"

10  instead of "sedentary," the ALJ erred by not providing reasons for

11  accepting the VE's deviations.  This contention lacks merit.

12          In determining whether suitable jobs exist that plaintiff,

13  with all his impairments, can perform, the ALJ may refer to the

14  classifications in the DOT and to testimony from an expert witness.

15  Light v Social Security Administration, 119 F3d 789, 793 (9th Cir

16  1997).  When expert witness testimony contradicts the DOT, the ALJ

17  may rely on the expert's testimony if there is persuasive evidence

18  in the record to support the testimony.  Johnson v Shalala, 60 F3d

19  1428, 1435 (9th Cir 1995).  In Moncada v Chater, the Ninth Circuit

20  held "the fact that some jobs listed by the vocational expert as

21  sedentary are also listed as 'light' work in the DOT is irrelevant,"

22  and that vocational experts can testify whether a claimant could

23  perform a subset of jobs at a lower level than the job's

24  classification in the DOT.  60 F3d 521, 524 (9th Cir 1995), citing

25  Distasio v Shalala, 47 F3d 348, 350 (9th Cir 1995).

26          The VE's testimony properly focused on the subset of jobs

27  in each of the categories he proposed for plaintiff that could be

28  performed at the sedentary level.

**United States District Court**
For the Northern District of California

1                             IV

2          "Remand for further administrative proceedings is

3   appropriate if enhancement of the record would be useful."   <u>Benecke</u>,

4   379 F3d at 593.

5          For the reasons stated above, plaintiff's motion for

6   summary judgment is GRANTED, the defendant's motion for summary

7   judgment is DENIED and the case is remanded for re-evaluation

8   beginning at step three consistent with this opinion.

9

10         IT IS SO ORDERED.

11

12

13                    _____
                      **VAUGHN R WALKER**
14                    **United States District Chief Judge**

15

16

17

18

19

20

21

22

23

24

25

26

27

28